<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MOSELL THOMAS and VERNA THOMAS, <br><br>             **Plaintiffs,** <br><br> v. <br><br> JERSEY MORTGAGE CO., AURORA LOAN SERVICING, LLC, SETERUS, INC. and FEDERAL NATIONAL MORTGAGE ASSOCIATION, <br><br>             **Defendants.** | Civ. No. 13-0648 (KM)( MAH) <br><br> **OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.**</u>:

## I.    Introduction

This is a suit by Mosell and Verna Thomas against a mortgage company, a loan servicer, and their successors in interest. It comes before the court on motions for summary judgment pursuant to Rule 56, Fed. R. Civ. P., filed by defendants Aurora Loan Service LLC ("Aurora") (ECF no. 102), Federal National Mortgage Association ("FNMA") (ECF no. 103), Seterus Inc. ("Seterus") (ECF no. 104), and Jersey Mortgage Co. ("Jersey Mortgage") (ECF no. 109).

The Thomases, seeking to buy an investment/rental property, originally applied for two loans—a $224,000 adjustable rate loan at 7.125% and a $56,000 second mortgage at a fixed rate of 13.6%. That arrangement was superseded when Mr. Thomas rejected the idea of a second mortgage. It was replaced by a single, fixed rate loan of $251,750 at 9.05%. Some of the papers in the file, however, appear to relate to the earlier proposal. The Thomases have fastened on the figure of 7.125%, contending that they were misled and should have received a fixed-rate mortgage at that rate. They have conveniently

1

jettisoned the other terms of the earlier offer: that the 7.125% loan was adjustable, that it was for a smaller dollar amount, and that it was accompanied by a second mortgage at a fixed rate of 13.6%. The Thomases, represented by counsel, signed a note and mortgage and accompanying paperwork, all providing that the loan in its final form was a fixed rate loan in the amount of $251,750, at 9.05%. They urge that they did not read the many documents that they signed, and are unsophisticated in matters of real estate, despite having purchased some 5–10 commercial properties. They made monthly payments under the 9.05% mortgage without complaint, raising their objections to the loan's terms only after they defaulted.

As I have implied, plaintiffs' claims are vulnerable on the facts. As it happens, however, discovery has disclosed multiple barriers to these claims as a matter of law: *Rooker-Feldman, res judicata,* the inapplicability of TILA and the statute of limitations. On those legal bases, summary judgment is awarded to defendants.

### A. Background

The plaintiffs, Mosell and Verna Thomas, have resided at 43 Winston Drive, Somerset, New Jersey, for over 35 years. (DSMF ¶1)[1] Mr. Thomas has a four-year college degree and has taken graduate courses in organic chemistry. He worked as a teacher, a salesman for chemical companies, and an insurance salesman before going out on disability in 1997. (M. Thomas Dep. 9:23–10:18, ECF no. 107-13 at 4–5) Mr. Thomas denies even the most basic understanding of real estate and mortgages. He is, however, experienced in the purchase of real estate. He has purchased two single family homes, as well as between five and ten multi-family buildings, and one eight-unit apartment complex. (M. Thomas Dep. 20:18–22:22, ECF no. 107-13 at 7–8)

One of those rental/investment properties was a single-family home, 112 South Lawrence Avenue in Franklin Township (the "Property"). (DSMF ¶¶ 2, 4)

---

[1]   DSMF =   Statement of Material Facts not in dispute in support of all Defendants' motion for Summary Judgment, ECF no. 104-2.

The Agreement of Sale between the seller, John Simko, and the Thomases is dated July 19, 2006; the original purchase price was $280,000. (DSMF ¶¶ 3, 5) (An agreed credit of $15,000 for repairs later reduced the price to $265,000.) (DSMF ¶ 7; *see* ECF no. 107-15 at 35, 37)

On September 6, 2006, Mrs. Thomas executed an agreement with Jersey Mortgage, checking the box stating that she did not want to lock in the rate. (DSMF ¶ 15; ECF no. 107-15 at 41; ECF no. 115-2 at 13) A Good Faith Estimate, dated September 6, 2006 (but apparently not signed by Mrs. Thomas until October 6, 2006), states that the loan amount is $224,000, and the loan is a 5/6 ARM. That abbreviation signifies that the rate was to be fixed at 7.125% for five years, then adjusted every six months thereafter. (DSMF ¶¶ 39–40; ECF no. 107-15 at 23). (ECF no. 115-2 at 20) A TILA disclosure form, signed by Mrs. Thomas on October 6, 2006, reflects an APR of 10.218%.[2] The form states at the top that it is "neither a contract nor a commitment to lend." (ECF no. 107-15 at 40) This loan as originally proposed required mortgage insurance. (ECF no. 107-15 at 45) The fax header indicates that these documents were all faxed by Mr. Thomas on October 9, 2006.

The remainder of the purchase price, as originally proposed, was to be covered by a second loan—a second mortgage securing a $56,000 fixed rate loan at 13.6%. As Mr. Thomas stated in his deposition, however, he rejected the idea of a second mortgage. (M. Thomas Dep. 47:24, ECF no. 107-13 at 14)

Although there is some confusing criss-cross in the communications, it emerges clearly that the final terms of the loan were different from those for

---

[2]    The Thomases portray the discrepancy between the 7.125% interest rate and the 10.218% APR as a fraudulent switch. A basic rate of interest, however, is not the same as an APR; the latter includes all costs, including points, taking into account the variable rate, and is intended to warn the consumer of the true annual cost of the loan. Generally, the APR rate is calculated, not based on the introductory or "teaser" rate, but as if the variable-rate index were applied today.

More fundamentally, however, this was the original loan proposal, not the loan the Thomases got. The fixed-rate 9.05% loan they actually received had an APR of 9.3662%. (ECF no. 107-15 at 46)

which the Thomases originally applied. In its final form, the loan was a single fixed rate loan, at a higher loan to value ratio, with no second mortgage and no mortgage insurance. As a result, the rate was higher. (DSMF ¶¶ 50, 51)

A notice of program change from Jersey Mortgage, dated September 27, 2006, and signed by the Thomases at closing on October 18, 2006, reflected the changes (DSMF ¶¶ 18, 19, 20):

DESCRIPTION OF PROGRAM CHANGE

<u>80/20 – 100% LTV 5/6 ARM TO 95% LTV – 30 YEAR FIXED</u>

(ECF no. 107-15 at 9; ECF no. 115-2 at 10; *see also* Uniform Residential Loan Application, ECF no. 107-15 at 28.)

On September 28, 2006, defendant Jersey Mortgage Co. faxed the Green firm a mortgage commitment letter. The following day, Green faxed it to Mr. Thomas under a cover letter asking for confirmation that there was no longer a second mortgage. (DSMF ¶ 11) This commitment, which explicitly superseded any earlier commitment, locked in a 30 year fixed rate mortgage loan at 9.05%, in the amount of $251,750. (DSMF ¶¶ 9, 41, 55; ECF no. 107-25) Also included in the September 28 fax was a Truth in Lending (TILA) disclosure statement and a Good Faith estimate. (DSMF ¶ 10–14)

The TILA disclosure stated that the total amount financed would consist of a single loan of $251,750. The interest rate was fixed at 9.05%, and the monthly P&I payment would be $2034.70. The Thomases executed the TILA statement. (ECF no. 107-15 at 46) The Good Faith Estimate contained the same loan terms, plus an estimate of closing costs, and was likewise executed by the Thomases on October 5, 2006.  (ECF no. 107-15 at 47)

The Thomases executed an Amendment to Mortgage Commitment, dated October 17, 2006, stating the amount of $251,750 and rate of 9.05%, with two discount points, totaling $5035. (ECF no. 107-14 at 57; ECF no. 115-2)

4

On October 18, 2006, the Thomases executed a uniform residential loan application in the amount of $251,750 at 9.05%. (ECF no. 107-15 at 28) [3] They executed a fixed-rate note at 9.05% on a loan of $251,750 for a term of 30 years. (DSMF ¶ 56; ECF no. 107-14 at 36) They executed a mortgage in the amount of $251,750. (DSMF ¶ 60; ECF no. 107-14 at 39) The Thomases executed an Affidavit and Agreement, dated October 18, 2006, which disclosed the 9.05% interest rate, the amount of the loan, and the $2034 initial monthly payment. (ECF no. 107-15 at 15)

The Thomases stated in the same Affidavit that they would live at the subject Property as their principal residence starting within 30 days. (DSMF ¶ 46; ECF no. 107-15 at 15) The Thomases executed an Occupancy Agreement stating that they would occupy the Property as their primary residence, and that failure to do so would constitute an event of default. (ECF no. 107-15 at 20; ECFD no. 115-2 at 12; see DSMF ¶¶ 16, 17) On October 18, 2006, the Thomases executed an Affidavit of Title which states that "after today," they would live at the subject Property. (DSMF ¶ 43; ECF no. 107-14 at 59) Mrs. Thomas executed a letter to Jersey Mortgage stating that they were selling their current home and purchasing the Property "[b]ecause we are down sizing." (ECF no. 107-15 at 34)

At his deposition, Mr. Thomas acknowledged that, at the time of the closing, his intent was not actually to live at the Property, but to hold it as a rental unit. (DSMF ¶ 44; M. Thomas Dep. 32:11–25, ECF No. 107-13 at 10)

The Thomases retained Jeffrey C. Green, Esq., of Green & Green, to represent them in the purchase. (DSMF ¶ 6) The closing took place on October 18, 2006, at the office of Green & Green, which are located around the corner from the Thomases' Somerset home. Signing the documents at closing was

---

[3]     There is also in the record another loan application, signed October 18, 2006, for a 5/6 ARM in the amount of $224,000 at 7.125%, plus a second mortgage of $56,000. (ECF no. 107-15 at 23; see also 107-15 at 14 (adjustable interest rate disclosure)) No explanation is given.

Jeffrey Green's law partner, his brother, Terry Phillip Green, Esq.[4] (DSMF ¶¶ 22–24, 26–27)

The Green firm charged the Thomases a fee of $850, plus costs of $145, to handle the closing, as reflected in the HUD-1 statement, which they signed. (DSMF ¶ 58; ECF no. 107-14 at 63; ECF no. 115-2 at 15) The firm's services included finalizing the contract, dealing with home inspection issues, setting up the closing, ordering title insurance and survey, attending the closing and disbursing loan funds, recording the deed, and obtaining the title policy. (DSMF ¶¶ 28–30) The Green firm ensured that the mortgage lien was in first position, and to that limited extent may be regarded as acting as the agent of the title company. (DSMF ¶ 34)

The closing was conducted in accordance with instructions from Jersey Mortgage Co. (DSMF ¶¶ 48, 49) The Green firm has never done any direct business with, or been retained by, Jersey Mortgage. The Green firm was not paid by Jersey Mortgage or the title insurer for handling the closing. Jersey Mortgage had separate counsel, paid for at closing by the Thomases as buyers. (DSMF ¶¶ 26, 36–37)

The servicing disclosure statement, executed by the Thomases on October 18, 2006, disclosed that the loan would likely be assigned, and told them they would be informed as to the identity of their servicer. (DSMF ¶ 42; ECF no. 107-15 at 7) On October 23, 2006, Jersey Mortgage sent Verna Thomas a letter stating that the servicing of the loan would be transferred to Aurora Loan Services, LLC. (DSMF ¶ 59; ECF no. 107-15 at 6) Aurora was not previously involved in the negotiation or closing of the loan. The mortgage itself was assigned to Aurora on August 29, 2008. (ECF no. 115-2 at 18)

On September 8, 2008, Aurora commenced a foreclosure action, *Aurora Loan Services, LLC v. Mosell J. Thomas and Verna Thomas, et al.,* No. F-34770-08 (N.J. Super. Ct., Ch. Div., Somerset Cty.) (DSMF ¶ 63) The Thomases

---

[4]   This was seemingly the "change of attorney" of which the Thomases complain.

answered the complaint. They did not deny having defaulted on the payments as of May 1, 2008. The matters they raised in defense included the following: (a) Aurora's agents made false representations; (b) they changed the interest rate from 7.125% to 10.218% and increased the monthly payments from $1503.13 to $2321.16; (c) they violated the Unfair Trade Practices and Consumer Protection Law; (d) they failed to provide the disclosures required by TILA, 15 U.S.C. §§ 1635, 1638, regarding high cost loans; (e) they took advantage of the Thomases' change of lawyers to increase the interest rate. (DSMF ¶ 65; Answer, ECF no. 107-1)

Aurora moved for summary judgment in the foreclosure action, and the Thomases opposed the motion. Their opposition included the Thomases' contentions that the lender had fraudulently switched the interest rate from the 7.125% rate quoted in the September Good Faith Estimate to the 10.128% rate in the TILA disclosure,[5] and hidden the change amidst the large volume of papers at the closing. On January 6, 2009, the court in the foreclosure action entered an order granting summary judgment to Aurora, striking the Thomases' answer, and transferring the case to the foreclosure unit. (ECF no. 107-2) Judge Derman found that the requisites of a valid mortgage and default as of May 1, 2008, were met. The TILA defense, which consisted of the Thomases' unadorned citations of statutory sections, was found inadequate. The allegations of fraud, the court found, were supported by no evidence of record. The TILA disclosure and Good Faith Estimate were provided to counsel on the same date; they reflected different calculations (the higher APR included closing costs and fees, for example). The actual Note and Mortgage were in the hands of the Thomases and their counsel, who witnessed their signatures. The difference between the estimate and the actual interest rate reflected a higher amount borrowed (the estimate was for a loan of $224,000, not the final amount of $251,750) as well as different terms (*e.g.*, adjustable vs. fixed rate,

---

[5]     Again, neither of these figures was the rate of the loan the Thomases actually received, which was a fixed rate of 9.05% and APR of 9.3662%. *See* p.3 n.2, *supra*.

*see supra*). The Thomases, the Court found, had paid the mortgage in accordance with its terms without complaint for approximately a year and a half, until they defaulted. The court concluded that there was no showing of fraud or misrepresentation. (*See* Decision, ECF no. 107-2)

On February 23, 2010, a final judgment of foreclosure was entered in favor of Aurora, in the amount of $287,036.48, and a Sheriff's sale was ordered. (DSMF ¶ 68; ECF no. 107-4)

On July 23, 2010, Aurora assigned the mortgage to FNMA. The assignment was duly recorded. (DSMF ¶ 66; ECF no. 115-2 at 19) FNMA engaged Seterus, Inc. to service the loan. (DSMF ¶ 66) Before that point, defendants FNMA and Seterus had no involvement in the loan. (DSMF ¶ 62)

On December 10, 2010, the Thomases filed a petition in bankruptcy in this District, No. 10-48206-RTL. (DSMF ¶ 69; ECF no. 107-16 at 2) The Thomases declared as assets their Somerset home, as well as rental properties, including the subject Property here. They sought a modification of the terms of their mortgage loans. *See Thomas v. U.S. Bank Nat. Ass'n,* 2012 WL 646056 (D.N.J. Feb. 28, 2012).

FNMA, per Seterus, moved for relief from the automatic stay in order to permit the Sheriff's sale to proceed. (DSMF ¶ 70; ECF no. 107-17) In response to that motion, the Thomases again raised the claim that the lender had violated TILA, failed to make necessary disclosures, and impermissibly raised the interest rate. (DSMF ¶ 71, ECF no. 107-18) By order dated April 4, 2012, Bankruptcy Judge Raymond T. Lyons granted the motion for relief from the stay. (DSMF ¶ 72; ECF no. 107-19) An appeal to district court was dismissed on jurisdictional grounds. (ECF no. 107-21)

In 2012, Seterus as servicer wrote to the Thomases offering options for loan modification. No response was received. (DSMF ¶¶ 74, 75)

The Thomases moved in Superior Court to stay the Sheriff's sale. That motion was denied. (ECF no. 107-22)

The Sheriff's sale occurred on January 29, 2013. The judgment on the writ of execution totaled $328,732.45. (DSMF ¶ 77) There being no competitive bids, FNMA bought the Property for $1000. FNMA resold the property for $140,000, sustaining a net loss of approximately $188,000. (DSMF ¶¶ 78, 79) *See* ECF no. 107-24, *passim.*

### B.     This federal court action

Two days after the Sheriff's sale, on January 31, 2013, the Thomases filed this federal court action. (ECF no. 1) The Complaint alleges that, in connection with the mortgage transaction, beginning in June 2006, Defendants violated the "federal TILD (Laws)," (I take this to be a reference to TILA); United States fraud laws, "US 15.4.6"; fraud and civil conspiracy laws, "15:4.6.2, 15.4.6.6"; and "7.7 breach of contract."

The pleading is not artful, but it is clear that the Thomases allege, as they did in the foreclosure action, that Jersey Mortgage quoted one interest rate, but the actual rate, as finalized, was higher. Additionally, Jersey Mortgage allegedly doubled the closing costs. Jersey Mortgage allegedly hired the Thomases' then-attorney to represent it at the closing, leaving the Thomases "without legal representation." At some point thereafter, Aurora serviced the mortgage, which it purchased from Jersey Mortgage, and later transferred it to FNMA, at which time it was serviced by Seterus. Compl. at ¶¶ 1–5. The Complaint allegesthat the resulting harms include foreclosure, and that the Thomases' physical and mental wellbeing, as well as their credit standing, has deteriorated.

## II.     Standard on a motion for summary judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

In determining whether there is a "dispute as to any material fact," In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof … the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations … and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, … there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III.   Discussion

### A.   *Rooker-Feldman*

Although defendants do not raise jurisdictional grounds, I am required to do so *sua sponte* where an issue of subject matter jurisdiction is apparent. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278, 97 S. Ct. 568 (1977); *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–77 (3d Cir. 2003). Many of the Thomases's claims, though not well defined, would be barred by the *Rooker-Feldman* doctrine, which is of jurisdictional stature. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923). Although the factual predicate for a jurisdictional dismissal was not apparent from the spare pleadings, it has now been established in discovery. A final judgment of foreclosure decided many of the very matters that the Thomases present to this court for decision.

A federal district court does not sit to hear appeals from state court judgments. *Rooker-Feldman* operates to prevent a disgruntled party in state court litigation from collaterally attacking the results of that litigation in federal court, claiming constitutional or other error. *See also B.S. v. Somerset County*, 704 F.3d 250 (3d Cir. 2013). To put it another way, *Rooker-Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus., Inc.*, 544 U.S. 280, 284, 125 S.Ct. 1517 (2005).

The *Rooker-Feldman* doctrine applies when, "in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996). Thus *Rooker-Feldman* holds that lower federal

courts cannot entertain federal claims that (1) were previously adjudicated in state court or (2) are inextricably intertwined with a prior state court decision. *Feldman, supra; Rooker, supra; Guarino v. Larsen,* 11 F.3d 1151, 1156–57 (3d Cir. 1993); *Port Auth. Police Benev. Ass'n v. Port Auth.,* 973 F.2d 169, 178 (3d Cir. 1992).

This case involves a "state-court judgment[] rendered before the district court proceedings commenced." *Exxon Mobil,* 544 U.S. at 284. A final judgment of foreclosure was entered by the State court on February 23, 2010. (DSMF ¶ 68; ECF no. 107-4)[6] This action was not filed until January 31, 2013.

The remaining question is whether the claims in this federal court action were previously adjudicated in, or are inextricably intertwined with, that state foreclosure proceeding. The state foreclosure judgment necessarily decided in Aurora's favor the following essential elements: the validity of the note and mortgage; the alleged default; and the Bank's right to foreclose. *See Great Falls Bank v. Pardo,* 263 N.J. Super. 388, 394, 622 A.2d 1353, 1356 (Ch. Div. 1993). "If the relief requested in the federal action requires determining that the state court's decision is wrong or would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit." *FOCUS,* 75 F.3d at 840. *See also In re Madera,* 586 F.3d 228, 232 (3d Cir. 2009) (federal court lacks jurisdiction over post-foreclosure claim for rescission of the mortgage); *In re Knapper,* 407 F.3d 573, 581 (3d Cir. 2005); *Ayres-Fountain v. E. Sav. Bank,* 153 F. App'x 91, 92 (3d Cir. 2005) (barring post-foreclosure federal claim for rescission of mortgage and damages); *Moncrief v. Chase Manhattan Mortgage Corp.,* 275 F. App'x 149, 153 (3d Cir. 2008) (barring a claim for "redress" of state court judgment in a foreclosure action).

---

[6]     A Sheriff's sale is not required to establish finality. *See Patetta v. Wells Fargo Bank, NA,* Civ. No. 09-2848, 2010 WL 1931256, at *7 (D.N.J. May 13, 2010). A sale did in fact take place on January 29, 2013, however, just before the federal complaint was filed.

The state court considered and decided many of the matters presented here. The Thomases' federal claims have a common thread: that Jersey Mortgage violated TILA and that they were defrauded as to the interest rate, which was switched at or before the time of closing. The Thomases' answer to the foreclosure complaint alleged that Aurora's "agents" (they mean Jersey Mortgage, its predecessor in interest) defrauded them by raising the interest rate from 7.125% to 10.218%, failed to provide the disclosures required by TILA, and did so by taking advantage of the confusion occasioned by the Thomases' change of lawyers. (Answer, ECF no. 107-1)

Aurora moved for summary judgment in the foreclosure action, and the Thomases opposed that motion. Judge Derman found that the requisites of a valid mortgage and default, beginning in May 1, 2008, were met. She rejected the TILA defense, which was unsupported by evidence. The allegations of fraud could not stand because the TILA disclosure and Good Faith Estimate, supplanting earlier offers, were provided to counsel. The actual Note and Mortgage, also in the hands of the Thomases and their counsel, reflected the change in the negotiated terms of the loan. The Thomases had, the Court found, paid the mortgage in accordance with its terms without complaining of invalidity for approximately a year and a half. The court concluded that there was no fraud or misrepresentation, and entered summary judgment against the Thomases. (*See* Decision, ECF no. 107-2)

To hold—as the Thomases ask this Court to do—that the defendants defrauded them about the interest rate or violated TILA would potentially invalidate the foreclosure judgment. *See Knapper*, 407 F.3d at 581. These are thus, to some degree, claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. To that extent, then, they are barred by *Rooker-Feldman*.

*Rooker-Feldman* disposes of any claim that is not "independent" of the merits of the foreclosure. To some extent, however, the claims may be independent. The Thomases seek to obtain damages on various grounds. It is difficult to tell, but these may consist of more than just an unwinding of what was lost in the foreclosure. To remove doubt, I consider in the alternative the primary grounds asserted in the defendants' summary judgment motions.

**B.     Res judicata/Entire Controversy**

Claims that survive scrutiny under *Rooker-Feldman* may nevertheless be barred by parallel doctrines of *res judicata*. *See Ayres-Fountain*, 153 F. App'x at 93 ("even if review of the complaint were not barred by *Rooker–Feldman,* we agree with the District Court that Ayres–Fountain's claims were barred by res judicata"). I find that to be the case here. The New Jersey doctrines of claim preclusion, issue preclusion, and the entire controversy rule furnish additional and alternative grounds for summary judgment in defendants' favor.

Whether a state court judgment should have a preclusive effect in a subsequent federal action depends on the law of the state that adjudicated the original action. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir.1999) ("To determine the preclusive effect of [the plaintiff's] prior state action we must look to the law of the adjudicating state."). *See also Allen v. McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 415 (1980). New Jersey claim preclusion law, like federal law, has three essential elements: (1) a final judgment on the merits; (2) a prior suit involving the same parties or their privies; and (3) a subsequent suit based on the same transaction or occurrence. *Watkins v. Resorts Int'l Hotel and Casino, Inc.*, 124 N.J. 398, 412, 591 A.2d 592, 599 (1991) (state law); *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984) (federal law). If those three requirements are met, then the doctrine bars "the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen,* 449 U.S. at 94, 101 S. Ct. at 414; *Watkins,* 124 N.J. at 412, 591 A.2d at 599 ("Claim preclusion applies not only to matters actually determined

in an earlier action, but to all relevant matters that could have been so determined.")

Claim preclusion in the traditional sense tends to be subsumed by New Jersey's "entire controversy" rule. The entire controversy rule emphasizes, not just claims within the scope of the prior judgment, but all *claims and parties* that a party *could have joined* in a prior case based on the same transaction or occurrence. The entire controversy doctrine thus "requires a party to bring in one action 'all affirmative claims that [it] might have against another party, including counterclaims and cross-claims,' and to join in that action 'all parties with a material interest in the controversy,' or be forever barred from bringing a subsequent action involving the same underlying facts." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 885 (3d Cir. 1997) (quoting *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 662 A.2d 509, 513 (1995)).

> We have described the entire controversy doctrine as "New Jersey's specific, and idiosyncratic, application of traditional res judicata principles." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). A mainstay of New Jersey civil procedure, the doctrine encapsulates the state's longstanding policy judgment that "the adjudication of a legal controversy should occur in one litigation in only one court[.]" *Cogdell v. Hosp. Ctr. at Orange*, 560 A.2d 1169, 1172 (N.J. 1989); *see also* N.J. Const. art. VI, § 3, ¶ 4 ("[L]egal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined."); *Smith v. Red Top Taxicab Corp.*, 168 A. 796, 797 (N.J. 1933) ("No principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon.")....

*Ricketti v. Barry*, 775 F.3d 611, 613 (3d Cir. 2014).

Like traditional res judicata, the entire controversy doctrine applies in federal court "when there was a previous state-court action involving the same transaction." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 163 (3d Cir. 1991). It extinguishes any subsequent federal-court claim that could have been joined, but was not raised in the prior state action:

> Under the entire controversy doctrine, a party cannot withhold part of a controversy for separate later litigation even when the

> withheld component is a separate and independently cognizable
> cause of action. The doctrine has three purposes: (1) complete and
> final disposition of cases through avoidance of piecemeal decisions;
> (2) fairness to parties to an action and to others with a material
> interest in it; and (3) efficiency and avoidance of waste and delay.
> *See DiTrolio v. Antiles,* 142 N.J. 253, 662 A.2d 494, 502 (N.J.1995).
> As an equitable doctrine, its application is flexible, with a case-by-
> case appreciation for fairness to the parties.

*Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 137 (3d Cir. 1999).

The preclusive effect of the rule is explicit: "Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine...." N.J. Ct. R. 4:30A. But the rule applies only to claims that could have been permissibly joined in the prior proceeding. And the entire controversy rule itself notes the limitations on claims in a foreclosure proceeding: "... except as otherwise provided by R. 4:64-5 (foreclosure actions) ...." *Id.*

The cited rule, N.J. Ct. R. 4:64-5, limits permissible claims in mortgage foreclosure actions to those which are "germane" to the foreclosure.[7] It follows, therefore, that only claims germane to the prior mortgage foreclosure will be

---

[7]    **4:64-5. Joinder of Claims in Foreclosure**

> Unless the court otherwise orders on notice and for good cause shown, claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt. Only germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court. Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidencing the mortgage debt, assumption agreements and guarantees. A defendant who chooses to contest the validity, priority or amount of any alleged prior encumbrance shall do so by filing a cross-claim against that encumbrancer, if a co-defendant, and the issues raised by the cross-claim shall be determined upon application for surplus money pursuant to R. 4:64-3, unless the court otherwise directs.

Claims that could not have been brought in the first proceeding also include those that were "unknown, unarisen, or unaccrued" at the time. *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 N.J. 310, 662 A.2d 523, 530 (1995) (citations omitted). Those exceptions are not implicated here. The entire controversy rule applies to parties, as well as claims, that were not joined in the prior action. *See Ricketti, supra* (requiring particular safeguards as to absent parties).

precluded in a later action. If the litigant could not have brought non-germane claims in the prior action, then they cannot be precluded by the prior judgment. As to what claims are "germane," the seminal case is *Leisure Technology–Northeast v. Klingbeil Holding Co.*, 137 N.J. Super. 353, 349 A.2d 96 (App. Div. 1975). "The use of the word 'germane' in the language of the rule," said the Appellate Division, "undoubtedly was intended to limit counterclaims in foreclosure actions to claims *arising out of the mortgage transaction* which is the subject matter of the foreclosure action." 349 A.2d at 98–99 (emphasis added). *See also Zebrowski v. Wells Fargo Bank, N.A.*, No. CIV.1:07CV05236JHR, 2010 WL 2595237, at *6 (D.N.J. June 21, 2010) (Rodriguez, J.); *see also Joan Ryno, Inc. v. First Nat. Bank of S. Jersey*, 208 N.J. Super. 562, 570, 506 A.2d 762, 766 (App. Div. 1986).

The entire controversy rule applies here. The state court mortgage foreclosure was "a previous state-court action involving the same transaction," *i.e.,* the mortgage, the default, and the foreclosure itself. *Bennun,* 941 F.2d at 163 (3d Cir. 1991). The subject matter of that prior action necessarily embraced that of this federal action, and the parties are the same or their privies.

In the alternative, the three prerequisites to claim preclusion apply here.

(1) There was a final judgment on the merits.

(2) The prior suit involved the same parties or their privies.

(3) The subsequent suit (*i.e.,* this one) is based on the same transaction or occurrence. It grows out, and is based on, the validity, or not, of the mortgage. *Watkins,* 124 N.J. at 412, 591 A.2d at 599.

Judge Derman's decision on the summary judgment motion leaves little doubt that the issues currently asserted germane to, and therefore were properly considered in, the foreclosure action. She considered, and rejected, the Thomases' contentions under TILA. She held that the Thomases' contention that the mortgage was obtained by fraud (the switching of the interest rate, and so forth) was obviously "germane" in that it would bar foreclosure. (ECF no.

17

107-2 at 11–12) She nevertheless found no evidence of fraud. She held that the Thomases, represented by counsel, could not have reasonably been misled as to the final terms of the mortgage.

As defenses, the claims that the Thomases bring here were actually asserted in the foreclosure; as counterclaims, they could have been. Under doctrines of res judicata and the entire controversy rule, the state court's final judgment of foreclosure extinguishes the analogous claims that the Thomases bring here. [8]

## C.   TILA: Commercial Transaction

The Thomases allege violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635. The gist of the allegations is that the disclosures they received in 2006 were inadequate or misleading. TILA, however, applies only to consumer transactions, not commercial ones. Mr. Thomas, despite many representations to the contrary at the time, now admits that the subject Property was not, and was never intended to be, the Thomases' residence. It was a rental property.

TILA explicitly applies to consumer credit transactions, defined as those in which "the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, household or agricultural purposes." 15

---

[8]   Viewing the matter from an alternative perspective, the Thomases are collaterally estopped from asserting factually that they were fraudulently misled as to the interest rate or that the TILA disclosures were inadequate or misleading. *See Winters v. N. Hudson Reg'l Fire & Rescue,* 212 N.J. 67, 50 A.3d 649, 659 (2012) (collateral estoppel, or issue preclusion, requires (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.)

U.S.C. § 1602(h). Implementing that general principle are certain explicit exemptions:

> This subchapter [*i.e.,* 15 U.S.C. §§ 1601–1667f] does not apply to the following:
>
>> (1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes....
>>
>> ....
>>
>> (3) Credit transactions, other than those in which a security interest is or will be acquired in real property, or in personal property used or expected to be used as the principal dwelling of the consumer and other than private education loans (as that term is defined in section 1650(a) of this title), in which the total amount financed exceeds $50,000.

15 U.S.C. § 1603 ("Exempted Transactions").

It is the purpose of the loan, not the character of the secured property, that controls the characterization of the credit transaction as consumer or commercial. The court must consider the purpose of the transaction as a whole:

> Even if a transaction has some personal purpose, the TILA does not necessarily apply...Moreover, several courts have agreed that simply because the loan is secured by a family home does not mean that the loan was primarily personal. *See, e.g., Sherrill v. Verde Capital Corp.*, 719 F.2d 364, 367 (11th Cir. 1983); *Bokros v. Assocs. Fin., Inc.*, 607 F. Supp. 869, 872 (N.D. Ill.1984); *In re DiPietro*, 135 B.R. 773, 777 (Bankr. E.D. Pa.1992).

*St. Hill v. Tribeca Lending Corp.*, 403 F. App'x 717, 720 (3d Cir. 2010) (although the mortgage collateral was the plaintiff's home, the purpose of the loan was to pay business creditors, so the loan was outside the scope of TILA).

In particular, a loan used to acquire a rental property is not a consumer credit transaction subject to TILA:

> As the District Court explained, Taggart could not show RESPA and TILA violations because, among other reasons, the financed property at issue in this case was a rental property at the relevant time. RESPA and TILA do not apply to transactions primarily for

business purposes. *See* 12 U.S.C. § 2606; 15 U.S.C. § 1603(1); 24 C.F.R. § 3500.5(b); 12 C.F.R. § 226.3(a)(1); 46 Fed.Reg. 50288 (Oct. 9, 1981) (Truth in Lending Official Staff Commentary explaining that the extension of credit for rental property, including a rented-out single-family house, is a transaction for a business purpose).

*Taggart v. Wells Fargo Home Mortgage, Inc.*, 563 F. App'x 889, 892 (3d Cir. 2014).

In a RESPA case (RESPA incorporates the business-purpose rule of TILA), I summarized the applicable law as follows:

> The TILA exempts credit extended for business or commercial purposes. 15 U.S.C. § 1603(1); Regulation Z, 12 C.F.R. § 226.3(a). The RESPA includes the same exemption for business credit transactions. 12 U.S.C. § 2606(a)(1); 24 C.F.R. § 3500.5(b)(2). The Board of Governors of the Federal Reserve System has directly addressed credit transactions to acquire rental property in its Official Staff Commentary on TILA Regulation Z:
>
> > Non-owner-occupied rental property. Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes. This includes, for example, the acquisition of a warehouse that will be leased or a single-family house that will be rented to another person to live in.
>
> Truth in Lending; Official Staff Commentary, 46 Fed. Reg. 50288, 50297 (Oct. 9, 1981) (as amended 75 Fed. Reg. 7658 (Feb. 22, 2010)). Such commentary is "dispositive" unless "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S. Ct. 790, 63 L.Ed.2d 22 (1980) (deferring to Federal Reserve Board opinions interpreting TILA and Regulation Z). Consequently, courts have consistently held that loans obtained to purchase non-owner occupied rental property are for a "business purpose" and are not covered by TILA. *Antanuos v. First Nat'l Bank of Arizona*, 508 F. Supp. 2d 466, 470-71 (E.D.Va.2007) (no right to rescind under TILA where loan was secured for commercial rental property and not the mortgagors' principal dwelling); *In re Fricker*, 113 B.R. 856, 866-67 (E.D. Pa. 1990) (loan received by debtors in exchange for mortgage on nonowner-occupied property was for "business purposes," and thus was exempt from TILA); *Puckett v. Georgia Homes, Inc.*, 369 F. Supp. 614, 618-19 (D.S.C.1974) (purchase of mobile home for rental purposes exempt from TILA disclosure requirements).

*Hernandez v. M&T Bank,* No. 15-CV-470 (KM), 2016 WL 816746, at *2 (D.N.J. Feb. 25, 2016).

The closing documents for the Thomases' loan required them to represent repeatedly that they were purchasing the Property as their primary residence. They did so, even stating that they were selling their Somerset home and "down-sizing." *See* p. 3, *supra.*

Those representations, however, were false; the Thomases continued to live in their Somerset home. In depositions, Mr. Thomas admitted under oath that they did not intend to sell their home, and that the Property was never intended to be the Thomases' residence:

> Q: All right. Now, it says you're selling your home at 43 Winston Drive [Somerset]. You actually didn't have your home up for sale at the time you wrote this, did you?
>
> A: No, we didn't.
>
> Q: All right. And it says you're buying the property in Somerset [*sic*], the 112 North Lawrence Avenue property because you were downsizing, is that correct?
>
> A: That's what they asked me to say.
>
> Q: All right.
>
> A: That was from the mortgage company.
>
> Q: In actuality, weren't you buying the 112 North Lawrence Avenue property as an investment?
>
> A: Yeah, I would say that.
>
> Q: You were going to rent it out?
>
> A: Yeah, I was going to rent it out.

(M. Thomas Dep. 32:11–25, ECF No. 107-13 at 10)

This mortgage and loan had a commercial purpose, *i.e.,* the acquisition of a rental property, one of several owned by the Thomases. TILA does not apply. On the TILA claims, then, summary judgment is granted in favor of the defendants on this alternative ground.

### D.   Statute of Limitations

#### 1.   TILA

Any TILA claim would also be barred by the statute of limitations. A claim for monetary damages under TILA has a one-year statute of limitations, which runs from the date of closing of the loan. *See* 15 U.S.C. § 1640e; *In re Community Bank of Northern Virginia,* 622 F.3d 275, 303 (3d Cir. 2010). A request for rescission under TILA must be brought within three years. That is a firm deadline, *i.e.,* a statute of repose that is not subject to tolling. *See* 15 U.S.C. § 1635(f); *Community Bank*, 622 F.3d at 301 n.18; *Williams v. Wells Fargo Home Mortg., Inc.,* 410 F. App'x 495, 499 (3d Cir. 2011).

This loan closed on October 18, 2006. This action was brought over six years later, on January 31, 2013. The discovery rule would not have appreciably tolled the limitations period. If the interest rate was higher than expected, the Thomases surely discovered that, at the latest, in connection with their first loan payment on December 1, 2006. In his deposition, Mr. Thomas admitted that he discovered that the rate was too high "right after the closing and they sent us the payment slip." The reference is evidently to the First Payment Letter. (ECF no. 107-15 at 18) That Letter, signed by the Thomases, discloses the total monthly payment and instructs them to include a copy with their first payment, due on December 1, 2006. Mr. Thomas testified that, although he was alerted to the alleged fraud at that time, he did not take any action because "I didn't know anybody I could call." (M. Thomas Dep. 153:19–23, ECF no. 107-13 at 40) The First Payment Letter, however, bears the name, address, and telephone number of Jersey Mortgage.

The TILA claims are barred by the statute of limitations.

#### 2.   Other claims

The Thomases' remaining claims are not clearly identified or elaborated, but they seem to sound in fraud and breach of contract.

22

The statute of limitations for a fraud claim is six years. N.J. Stat. Ann. § 2A:14-1. That limitations period runs from when the fraudulent act or omission occurred, or could have been discovered through the exercise of reasonable diligence. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 425 (3d Cir. 1999) (New Jersey law). The applicable statute of limitations for breach of contract is likewise six years. N.J. Stat. Ann. § 2A:14-1. The contract limitations period runs from the time of the opposing party's breach or repudiation of the contract. *See Peck v. Donovan,* 565 F. App'x 66, 69 (3d Cir. 2012) (New Jersey law); *N.J. Div. of Taxation v. Selective Ins. Co. of America,* 399 N.J. Super. 315, 326 (App. Div. 2008).

Once again, any cause of action for fraud or breach of contract accrued at or about the time that this loan closed on October 18, 2006. This action was brought more than six years later, on January 31, 2013. The discovery rule, for the reasons expressed in the preceding subsection, could not have appreciably tolled the limitations period, because Mr. Thomas admits that he knew the relevant facts immediately after the closing.

The Thomases' miscellaneous state law causes of action are barred by the statute of limitations.

### E.  "Hiring away" the Thomases' attorney

The Thomases allege that Jersey Mortgage "hired away" their attorney, the Green firm, thereby denying them counsel. The record is insufficient to raise a genuine material issue of fact as to that claim.

As noted in the factual discussion above, *see* pp. 5–6, the Green firm represented the Thomases, and only the Thomases. Jersey Mortgage had its own counsel. As is the practice in the northern part of this State, the buyer's attorney handled the closing paperwork and conducted the closing. *See generally Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 339–40, 634 A.2d 74 (1993). Mr. Thomas objects that this role distracted Green from giving Thomas his full attention. Mr. Thomas's evident dissatisfaction with Green's services

23

does not equate to a finding that Green was "hired away" by Jersey Mortgage and render Jersey Mortgage liable. There is no evidence that Jersey Mortgage hired, retained, or otherwise enlisted the services of Green. Nor are Green's efforts to ensure good title evidence that he was "really" working for Jersey Mortgage or the title company; ensuring that title properly passed to the Thomases was part of Green's job.

Summary judgment is granted to the defendants on the "hiring away" claim.

## CONCLUSION

The defendants' motions for summary judgment are granted. An appropriate order accompanies this opinion.

Dated: September 8, 2016

KEVIN MCNULTY
United States District Judge